

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-364-CR

MICHAEL ANTHONY KELLY                                      APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In two points, Appellant Michael Anthony Kelly appeals his conviction for murder. We affirm.

## II. Procedural Background

---

[1] *See* Tex. R. App. P. 47.4.

We discuss the evidence in greater detail below, but, in short, bad blood between a drug dealer and a dancer culminated in a rapper's death after a shooting outside an after-hours club in Arlington, Texas. Kelly was charged with the death of the rapper, Sheena Perkins. The jury disregarded his self defense and defense of a third person claims and found him guilty of murder. In a special punishment issue, the jury found sudden passion arising from adequate cause and assessed fifteen years' confinement as punishment. *See* Tex. Penal Code Ann. § 19.02(a), (d) (Vernon 2009). This appeal followed.

### III. Self Defense

In his first point, Kelly claims that he is entitled to a new trial because the great weight and preponderance of the evidence shows that he acted in self defense so that it is manifestly unjust that he was convicted of Sheena's murder.

### A. Evidence

To fully explain the events that led the State to charge Kelly with causing Sheena's death, the jury had to understand the history between the drug dealer, Jonathan "J.J." Coffey, and the dancer, Chasity "Chat" Clark.

### 1. Events in November and December 2006 Leading to Shooting

J.J., a high school dropout in his mid-thirties and father of six, was incarcerated at the time of the trial because he had pleaded guilty to a federal felon-

2

in-possession-of-a-firearm charge.[2] He and Oneil "O.C." Coombs Mahoney became partners in drug dealing in 2006; neither was otherwise employed. J.J. was married to Cyntrell Mitchell and had relationships with O.C.'s sister Telethia and with Sheena.[3]

O.C. had been arrested multiple times, and J.J. had spent around $25,000 to bail him out three of those times. J.J. did not bail O.C. out a fourth time. Chat, a dancer at Club Hard Bodies and Harlem Nights, had been O.C.'s girlfriend for three years.[4] It is undisputed that J.J.'s failure to bail out O.C. angered Chat and led to a physical altercation in November 2006 between her and J.J.'s "sister," Samantha Coffey.[5]

J.J. described the altercation as a loud, heated argument that started when he arrived at the apartment he used for drug sales. Chat and Portia (another woman

---

[2] ... J.J. testified that he had a bargain with the State that nothing new he admitted during his testimony would result in prosecution and that he hoped his testimony would result in a reduction of his federal jail time. J.J. had prior convictions for delivery of a controlled substance (cocaine) and possession of a controlled substance (cocaine) and pending drug charges.

[3] ... Sheena had her own criminal history, having pleaded guilty to the offense of making a terroristic threat, a class B misdemeanor, for threatening to commit murder or aggravated assault.

[4] ... Chat also had a criminal history, serving ten months in state jail for violating her community supervision on a drug possession offense.

[5] ... Samantha and J.J. are actually cousins. In exchange for her testimony, Samantha's pending misdemeanor evading arrest charge was reduced to a disorderly conduct charge.

J.J. dated) were there when he arrived. Chat confronted J.J. about O.C., and then Samantha and Chat began fighting over Chat's "going off on [J.J.] like that." The fight ended when Samantha threw Chat out of a window.

J.J. said that Chat and Portia left the apartment but returned twenty minutes later with Rico, someone he knew through O.C. J.J. stated that Chat made threats to him like "I'll have you killed." The argument continued until Samantha threatened to call the police.

J.J. testified that he returned to the apartment a few days after the fight. He answered a knock at the door, and three or four people entered, shot him in the head, and robbed him of around $17,000. J.J. figured that Chat was responsible for the robbery because only she and O.C. knew where he had hidden the money, and O.C. was still in jail. Chat testified that she started receiving threats from J.J. like "Bitch, I'm going to kill you," "You dead when I see you," and "I want my money," and that J.J. initially made twenty to thirty threats a day, then five to seven per day, and finally stopped when O.C. was released from jail a week after the robbery. Chat stated that she took these threats seriously and said that she had seen J.J. with guns on several occasions.

J.J. tried to track Chat down, going with his friend Donna Dears to the clubs where Chat worked and telling people that Chat had stolen from him. J.J. recalled making threats to Chat throughout December 2006, including that he was going to have her beaten up and have other women assault her, but he said that this was

4

after she threatened him first.[6]  J.J. denied telling Chat that he was going to kill her, and he stated that he only started carrying a gun after he had been shot during the apartment robbery.

Kelly, who was thirty-four years old at the time of trial, testified that he was a high school graduate, had taken two years of college courses, and had worked for United Parcel Service for fourteen years before suffering an injury.  At trial, he was married but separated and had three children with his wife in addition to a baby with Chat.  He met Chat at Club Hard Bodies.

Kelly testified that Chat told him about the fight at J.J.'s apartment and J.J.'s threats.  Chat stated that Kelly told her, "[W]ell, just stay away from over there," and that she could hang out with him "to avoid all that."  Chat and O.C. split up not long after O.C. got out of jail, and she and Kelly started dating.  Kelly stated that, other than Chat, he did not know anyone involved prior to the shooting and that he did not try to meet or confront J.J. in any way after Chat told him about the November fight and the threats.

---

[6] ... Donna testified that she had heard some of the threats exchanged between J.J. and Chat, that J.J. asked her to fight Chat, and that she would have if they had found her.  She testified at trial in jail clothes because she had been convicted in 2008 of possession of a controlled substance (cocaine) with intent to deliver.  Her other convictions were for credit card abuse, misdemeanor theft by check, and forgery.

### 2. The Afterlife

The Afterlife is an after-hours club located at 2612 Avenue E East in Arlington. The shooting occurred between the club's front parking area and the street. Roy Carter, one of the club's valets,[7] and Arlington Police Officer Duncan J. Durham described the Afterlife's parking area:

There is a parking lot directly adjacent to the club's entrance that contains three spaces near the entrance (Roy's "expensive" parking, also known as "VIP" parking); additional spaces along the side of the building and a parking lot in the back of the building (Roy's "regular parking"); and a parking lot that belongs to an adjacent building, which is separated from the Afterlife property by a curb (Roy's "at your own risk" parking). Officer Durham testified that there were several ways to access the back parking lot from the street. State's Exhibit 33, an aerial photograph, shows that the parking lot at the front and side of the club is connected to the club's back parking lot.

J.J. testified that he and Chat were regulars at the Afterlife and that he met Sheena there through their mutual friend Monty Wayne, another rapper. Roy confirmed that J.J. was a regular, but he testified that before February 25, 2007, he had never seen Chat, Kelly, or Sheena at the Afterlife.

### 3. February 25, 2007

---

[7]... As a "valet," Roy charged fees to direct patrons to parking spaces.

6

### a. Before the Shooting

J.J. and Sheena each took two or three Ecstasy pills on February 24 and decided to go to the Afterlife. Samantha had been drinking and smoking "weed" at another club when she called J.J., who told her to meet them at the Afterlife.

The Afterlife was crowded. J.J. testified that he and Sheena arrived at the club when it opened around 2 a.m.[8] He backed the custom-painted purple Suburban he was driving into one of the three VIP parking spaces at the club's front entrance. J.J. did not pay the valet charge. Roy stated that, at the time, he assumed he would receive his parking fee later since J.J. was a regular.

Samantha met J.J. and Sheena outside the Afterlife. J.J. gave her an Ecstasy pill, which she took before they went inside.[9] J.J. stated that security searched him for weapons when he entered the club,[10] and then he, Samantha, and Sheena went into an area with a backdrop for photographs and posed for several photos with a group. J.J. testified that the photos show some people (but not him) throwing gang signs, that he did not recognize some of the gang signs Sheena was making, and that he was not a gangster.

---

[8] ... J.J.'s friend Donna testified that she was at the Afterlife after 2 a.m.

[9] ... Samantha also smoked around five blunts that night.

[10] ... Samantha testified that she did not feel like security was really serious about patting people down and that she could have brought a gun into the club if she had wanted to. She testified that she was probably carrying a pocketknife that night, stating, "I always have a knife if I go in a club. Always."

7

Kelly and Chat both testified that it was Chat's idea to go to the Afterlife that night and that they had been there a few times before, including Valentine's Day, when Dwight Hollis, a photographer, took their photo.[11] Chat stated that she did not think J.J. was going to be there on February 25, but she did not explain why she thought this.

There is some conflict in the testimonies about when Chat and Kelly arrived at the Afterlife and how they got into the club. Roy testified that he thought they had arrived before J.J. and that Kelly offered him $50 to get into the club without waiting in line. He said that he directed Kelly to someone who could get them in. He also testified that although the Afterlife's front door security searches people to keep weapons out, a person can pay some money and get in through a side or back door with a weapon.

Chat and Kelly both testified that they arrived around 3 a.m. Kelly testified that he asked the valet about prices for the different parking areas and then requested a parking spot "like near ways upside—side the club." Then they waited outside at the club's front entrance for around twenty minutes before he was ready to give up and go home.[12] He and Chat were walking back to his car when one of the parking attendants told him to hold on and told another guy to take them to the side

---

[11] ... Police used these photos to identify Kelly after the shooting.

[12] ... Per the photographs admitted at trial, if Kelly and Chat's estimation of their arrival time was correct, they would have been waiting around the same area where J.J.'s Suburban was parked.

8

entrance. Kelly stated that there was a crowd at the side door too, that they paid the regular fee to get in, and that they were searched by security as they went in.

According to J.J., Chat and Kelly walked into the photo area around thirty to forty minutes after he, Sheena, and Samantha arrived, while they were taking photos. He said that he had never seen Kelly before that night, and Kelly said the same about J.J.

Chat said that when she saw J.J. in the photo area, she said to Kelly, "There go that nigger right there," explaining that she meant "that's the one that had all this shit going on, you know; the one that was threatening me and pretty much the one that's harassing me." Kelly testified that he told Chat, "['J]ust, you know, don't worry about it too much.['] It had been like—it had been like awhile since the fight, so I felt like, you know, they probably—he probably would let it die down or wouldn't be so angry as he was at first."

J.J. stated that when he saw Chat and Kelly, he said to Monty, "Look at that bitch right there coming in the door," or words to that effect. J.J. said Chat turned around because she heard him, but Kelly pushed her in the back and told her to go on. Kelly testified that as they walked through, he heard J.J. say to the guy standing next to him, "I can't stand that bitch. I want to kick her ass." Kelly said that they kept walking and that he did not confront J.J.[13] Chat said that J.J. saw her but did not say

---

[13] On cross-examination, Kelly denied that he said to Chat, "Don't worry about that N-word, I got it."

9

anything to her and that she and Kelly decided to finish their drinks and leave. Kelly stated that they did not leave at once because Chat asked him if they could finish their drinks first.

### (1) In the VIP Room—Testimony

Chat led Kelly into a nearby room (the "VIP room") to finish their drinks, and they sat down on the left side of the room. Chat testified that there were three or four people in the room when they entered, but Kelly said he thought they were alone.

J.J. stated that while he continued taking photos, Samantha and Sheena left and that he later joined them in the VIP room. Samantha testified that Sheena had rolled a blunt, that she, Sheena, and J.J. were all smoking in the VIP room, and that she had seen Chat and Kelly in the photo area thirty to forty-five minutes before she encountered them in the VIP room.

The VIP room was tiny, only six or seven feet long, but J.J. stated that he did not recall seeing Kelly or Chat in there because he was not paying attention. He denied saying to Samantha or Sheena, "You need to jump on this girl," or words to that effect. Samantha stated that, at first, she did not see Chat while she was smoking the blunt with Sheena, but then she noticed Chat dancing and saw a gun

10

in Kelly's waistband. Kelly testified that he did not have a gun on him at the club but that he had a nine millimeter gun in his car.[14]

Chat stated that she saw J.J. walk into the room, talk to somebody, and walk back out. She testified that when J.J. walked back out,

> I like felt like somebody was staring at me. And when I looked up, it was Samantha, and she was staring at me. And then I just kind of like put it together. I was like, Oh, he must have been coming in here and talking to them, or whatever. And then he stuck his head back in the door, you know, and . . . [moved his head] like, you know, what's up or what y'all going to do or something like that.

Chat testified that this was the first time that she had seen Samantha since their fight and that Samantha looked different because she was wearing an orange wig. Chat stated that Sheena stared at her too.[15] On cross-examination, Chat testified that Samantha looked away when Chat looked back, avoiding eye contact and moving her head to keep her hair in her face.

Kelly testified that after he and Chat had been sitting in the VIP room for a minute, it seemed like J.J. "just materialized," startling him. J.J. did not say anything

---

[14] Crime scene investigator Susan Ozuna testified that all of the casings she found at the crime scene were nine millimeter RP Luger shell casings of the same brand. Tarrant County Medical Examiner's Office firearms examiner Jamie Becker testified that she examined the nine shell casings, all from nine millimeter Luger cartridges and all fired from the same unknown firearm.

[15] Chat did not know Sheena but had been told that she was Monty's sister and had seen her in a photo with Monty, O.C., and J.J. at J.J.'s apartment. After Chat was thrown out of the Afterlife, she saw Monty in the parking lot. When he denied that Sheena was his sister, she replied, "You know who I'm talking about. Whoever she is, you need to get her because she wrong."

11

to him; he leaned over to talk to someone—Kelly could not see who it was—and then left. A few minutes later, J.J. returned. Kelly said that he tried to ignore this but felt like something was about to happen. He said that Chat identified Samantha as the woman she had fought at J.J.'s apartment. Kelly stated that he figured he and Chat would just wait them out because they were blocking the door and he did not feel like they had any other options.

Chat testified that she thought something was going to happen because of the way J.J. was acting, making her think that he was going to have Sheena and Samantha "jump" on her. She told Kelly, "Don't let them jump on me." But then, instead of leaving, Chat got up and started to dance in front of Kelly.

Kelly said that while Chat was dancing, he watched Samantha and Sheena. He stated, "I noticed a couple of times that [Sheena] . . . was throwing gang signs and . . . raising up her shirt. I guess she was showing a tattoo. But, you know, it was just kind of like posturing." He thought they were "trying to get their nerves up to go ahead and jump [Chat]." Kelly said that as soon as Chat asked him not to let them jump on her, he stood up at her side to protect her.

Chat testified that she was the only one dancing and that Samantha and Sheena started closing in on her. Samantha testified that she watched Chat and that she received the impression that something might happen between Chat and Sheena because they were "plexing"—"picking with each other" while dancing.

12

Chat and Kelly both testified that Sheena elbowed Chat as Sheena and Samantha left the VIP room. Chat stated that she staggered first, "bumped it back," then turned around and hit Samantha in the face because she thought Samantha was going to attack her from behind. Chat said that Kelly jumped up and tried to break up the fight as it spilled out into the hallway. Kelly testified that Chat went after Sheena when Sheena bumped her and he tried to break it up. Samantha testified that Kelly hit her and that she did not know where Sheena went while she was fighting Kelly and Chat. Kelly said that he did not hit Samantha.

### (2) In the VIP Room—DVD

Both parties published a seven-minute security DVD from the VIP room to the jury. The DVD shows part of the small dark room and has no audio. The VIP room contains a sofa next to a lamp on one wall. Against an adjacent wall, there is a laptop computer, a flat screen television above the laptop, and a chair next to the laptop. From the number of people that pass through the room, it appears that there are two exits.

When the DVD begins, J.J. is swaying and smoking while standing in front of Sheena. Sheena sits on the sofa near the lamp. J.J. leaves, walking past where Kelly and Chat sit.[16] A female in a black shirt with "STAFF" in white on the back sits

---

[16] ... The DVD does not show Chat and Kelly's entrance. We infer that they were already present at this point from Chat's testimony that she and Kelly were off-camera where they sat and from Chat's sudden appearance in the lower left side of the room (as if she stands up from sitting in a location out of the camera's view) about halfway through the DVD.

13

down next to Sheena and they appear to talk. Samantha sits on the arm of the chair next to the laptop, across the room from Kelly and Chat. She hands a blunt to Sheena and walks over to where Kelly and Chat are sitting before walking back to the chair.

Around a minute later, J.J. walks back into the room and hands Samantha a blunt on his way to Sheena. He appears to greet the staffperson and to dance with Samantha for a moment. He looks in Chat and Kelly's direction while he dances and drinks.

Sheena stands when J.J. walks over to her, but she is initially blocked from the camera's view by the staffperson, who stands up and takes the blunt from Samantha. Sheena and Samantha pass the blunt back and forth several times. J.J. greets other people as they enter the VIP room, and he throws some gang signs before walking back out. Chat first appears on the DVD moments later at the bottom left portion of the screen, dancing with a drink in her hand.

Samantha alternates between sitting on the arm of the chair and standing up, occasionally moving in place. Three people file in and sit on the sofa where Sheena had been sitting. Sheena dances behind Chat while smoking, gradually moving closer to her. Other people file in and out of the small room, standing, dancing, chatting with Sheena or Samantha, and from time to time, walking between where Sheena and Chat are dancing. When Sheena turns her back to Chat and Kelly, Sheena lifts up the back of her shirt while continuing to dance.

14

At one point, Samantha appears to stand next to Chat before returning to sit back down on the chair by the laptop. Chat continues to gyrate with a drink in one hand. Chat leans down out of the camera's view, and then Kelly stands up. Chat sways alongside him while Sheena and Samantha pass their blunt back and forth and sway in front of them. A male staffperson talks to Sheena and Samantha, and then Samantha hands a purse to Sheena. Sheena appears to make some farewells to the people on the sofa and heads toward an exit. The DVD is unclear as to whether Chat touches Sheena as Sheena walks past her, but Sheena clearly bumps Chat and then a fight ensues.

### (3) Outside the VIP Room

Bouncers broke up the fight pretty quickly. Samantha stated that, once outside of the VIP room, she and Sheena separated to find J.J. J.J. stated that five to ten minutes after he left the VIP room, Sheena and Samantha ran back around to the photo area, demanding to leave. Samantha was carrying her wig "like someone had knocked it off her head."

J.J. said, "Everybody in the club was telling us, 'Go on, leave,'" but he also said that security did not ask Samantha and Sheena to leave.[17] He said that he did not know that Samantha and Sheena had been in a fight with Chat until the next day. But Samantha testified that although she did not tell him right then that someone had

---

[17] ... Donna testified that, contrary to what she told police on February 25, she did not see security evict Samantha and Sheena from the club.

15

hit her, Sheena told J.J. about it.  Samantha supposed this made J.J. mad, and "[h]e was already drunk."  She gave the following testimony about Sheena having a weapon:

Q.  So Sheena came up to y'all while you were talking to [J.J.]?

A.  No.  We made it—she was in the hallway, the hallway [outside the VIP room] . . . .  She was in that hallway.  She pulled out—I guess there was a gun.  She had a gun.  It was pulled out in that hallway.  Everybody—it was just commotion, you know.  [J.J.] was like, ["]Where's Sheena?["]  By this time, she was coming back—the security guards was [sic] trying to, I guess, maybe make her leave out or—I really don't know what they were trying to do.

        . . . .

Q.  You said something about a gun—just now.  Sheena had a gun?

A.  Yeah.

Q.  When did you see Sheena with a gun?

A.  When I had done found my brother [J.J.] and that—it was—it was commotion.  She was in that hallway.

Samantha added that she did not see the gun again but guessed that Sheena had put it in her purse.

Security escorted Chat and Kelly from the club.  Once outside, Chat realized she did not have her purse; security would not let her back in but allowed Kelly to go back to look for it.  Five or ten minutes later, he rejoined Chat without the purse and told her to get in the car.  Kelly said he tried to collect himself once they were in the car, and then he put the gun that had been under his seat "in between the console"

16

and the side of the seat. He started to slowly drive out of the Afterlife's parking lot the same way he had come in—by the Afterlife's front entrance.

J.J., Samantha, and Sheena were starting back to the Suburban when Roy saw them. He stated, "It seemed like [J.J.] was upset, and it really, to me, it seemed like something happened. So it seemed like something had happened, and he was upset and ready—like he was ready to do something, you know. I mean, I just remember him talking about having a tool" and about having a pistol and wanting to do something. Roy added that he believed "tool" meant "gun."

Roy walked towards J.J. because he wanted his valet fee. When he shined his flashlight on Sheena's purse, he saw a gun, which he described as semi-automatic and chrome-plated or nickel-plated. He testified that he said, "Y'all need to take that somewhere else," and that Sheena told him that it had nothing to do with him in a manner that he described as "kind of subtle, you know, like serious." He did not take her remark as a threat towards him.

Sheena climbed into the Suburban's front passenger seat and Samantha climbed into the back, but they did not leave immediately. Roy stated that J.J. had his window down. Roy persisted in trying to get his valet fee and did not recall seeing either J.J. or Sheena with a gun at that point. Samantha and Roy both recalled J.J. and Sheena talking about what had happened inside the club; Roy

added that J.J. talked about fighting someone and said something like, "It can happen right here." At that, Roy concluded, he would just get his fee later.[18]

### b. The Shooting

On appeal, the parties do not appear to dispute that Kelly shot Sheena but challenge whether the great weight of the evidence shows that his actions were justified.

### (1) Chat and Kelly's Version

Chat testified that as Kelly approached the parking lot exit, she saw Samantha standing next to the Suburban, talking to J.J., who was in the driver's seat. She yelled for Kelly to stop the car as they passed the Suburban. Kelly described Chat making a high-pitched sound and then screaming for him to stop. Kelly said that when Chat said "stop," he stopped the car toward the front of the parking lot, in front of the Suburban.[19]

---

[18] Roy stated,

[J]ust my own intuition, because I don't remember whether it was something that they said about the other vehicle approaching or not. I just remember something just told me to back up, because I seen he wasn't paying me any attention, you know, and something obviously was happening or going to happen. That's what was going through my mind, you know, and I had already seen a weapon in the car—I mean[,] on the girl. So I figure that, you know, I probably need to leave it alone. I'll see him again.

[19] On cross-examination, Chat said that Kelly did not completely stop the car until they were out of the parking lot. "He pulled right up on the curb and stopped."

Chat rolled down her window and, according to Kelly, began to tell J.J. in "choice words that he needs to just leave that alone and she was just tired of him." Chat said that she and J.J. locked eyes and she cussed at him, saying "You know you wrong for this" and "Stop messing with me. And why are you still tripping? Why are you still fucking with me? Why are you on this bullshit?" Sheena's window was down, and she and Sheena ended up in a "cuss fight."

Kelly said that J.J.'s eyes lit up when he saw Chat and then "[J.J.] told her choice words back." He saw something in J.J.'s hand that he thought was a gun, and then J.J. said, "Bitch, I'll kill you." Chat described J.J.'s reaction as "[i]t was like fuck you, fuck you, fuck you; just a whole lot of fuck yous going back and forth. And he waved a gun and he put the [Suburban] in gear and he came around." When she saw the gun, she told Kelly, "He got a gun. Like, Oh, shit." Kelly said he was already aware of the gun at that point. He said that he had not picked up his gun at that point and that "[w]hoever said they seen a gun or said that I picked up a gun then is a liar . . . . They're lying, because I didn't pick up a gun yet."

Kelly drove out of the parking lot, turned right, and then stopped the car, explaining:

> The thing—the thing that I'm thinking, I'm knowing he got a gun, and I'm just feeling like if—if he going to do something to me, I'm not going to have a way—I'm not going to have no way to protect myself or defend myself, because whoever in that car, they can shoot me straight through the back of the car, shoot anybody in the car, just shoot through the car window.

19

He grabbed his gun and got out of the car, explaining on cross-examination that he did it not only to take a defensive position but also to give J.J. a chance to leave without any problems.

The Suburban exited the parking lot, turned right, and came around at them—Chat said that she thought she saw three people in the vehicle. Kelly said that, as the Suburban entered the road from the parking lot, he thought, "[T]hey're going to come this way and they fixing to do something." Kelly stated that he knew anyone in the Suburban could kill him or Chat but that he did not know which of the Suburban's occupants, other than J.J., had a weapon. He did not know that Sheena had a gun.

Kelly raised his gun and started shooting. He said that he was aiming "at nothing in particular" nor at anyone in the Suburban and that he was just shooting in the Suburban's direction "[b]ecause they was coming toward me, and from everything that had happened up until that moment, it told me that when they came toward me, they was going to start shooting." He testified that he was in fear for his and Chat's lives and that he was trying to save their lives by scaring the Suburban's occupants away. He did not remember how many times he fired the gun.

Chat testified that once the Suburban turned, she heard "boom, boom" from J.J.'s vehicle, which sounded like two gunshots to her, but she did not see any shots fired. The next series of "booms" sounded like they came from right next to her, then

20

Kelly got back into the car, and they drove to Dallas. Chat testified that she had not realized until then that Kelly had gotten out of the car.

Kelly said that after the Suburban drove past him, he got back in the car and threw the gun in the back seat. He was not sure that anyone in the Suburban shot at him.[20] After he left Chat on February 25, Kelly threw the gun off the side of the highway and returned the red car to its owner, "a guy [he] knew who owned a car lot." Kelly did not see any bullet holes in the car.

Kelly stated that he did not want the confrontation to happen that night, he did not want to shoot anyone that night, and he did not want Sheena to die. He "just didn't want to get shot [him]self," and he did not want Chat to get shot. Chat and Kelly both said that they did not find out until later that Sheena had died.

### (2) J.J.'s Version

---

[20] ... On cross-examination, Chat gave the following testimony:

Q. But you're sure that J.J. started shooting first?

A. Yes.

Q. And if it was otherwise, first of all, he'd be in trouble, right?

A. Who?

Q. Your baby's daddy [Kelly].

A. Say that again.

Q. I mean, if [Kelly] shot first, that wouldn't look good, would it?

A. No, it wouldn't.

21

J.J. stated that the red car pulled up and stopped in front of the Suburban and that Samantha told him that the people in the car had a gun but he did not see one. "Next[,] the [red] car pulled out some, pulled in the street and stopped.[21]  That's when Chat was getting out of the car and she was hollering.  And Sheena rolled the window down.  They went to hollering back and forth at each other."  J.J. testified that he saw Kelly get out of the car, go to the back of it, squat down, and start firing. He did not see Kelly point the gun.

J.J. ducked down, put the car in drive, "smashed" the gas, drove "up the street," made a U-turn, drove back down the street, and pulled into a nearby gas station.  He did not know if the shooting continued while he drove away.

### (3) Samantha's Version

Samantha stated that the red car pulled up in front of the Suburban and stopped, blocking it in.  She told J.J., "That's them right there."  She added, "I guess it was Chat on the passenger side," and she guessed that Chat had the gun.  The red car then pulled on to the side of the Suburban.  Samantha heard Chat say, "Nah, nigger, don't run now," and then Chat and Kelly stepped out of the red car. Samantha did not see whether either had a gun because she "wasn't trying to see no more"; she let herself out of the Suburban and crawled under a nearby car.  She heard shots fired, but she did not see who was shooting or see if there was more

---

21 ... J.J. subsequently clarified that he meant "halfway in the parking lot and halfway in the street" at an angle.

22

than one gun. She said that the Suburban moved after the shots were fired and drove east down Avenue E, then made a U-turn, but she also said that she did not see J.J. drive away and that she did not see J.J. stop anywhere.

### (4) Donna's Version

Donna had parked her car in the parking lot on the left-hand side of the club. She saw J.J.'s window was open ("cracked some"), but she did not stop to talk with him. As she continued to her car, she heard gunshots. She turned and saw J.J.'s Suburban pulling out and a guy standing in front of a red car, shooting at the Suburban. Chat was in the car's front seat. Donna did not see J.J. or Sheena point a gun. She stated that the Suburban was already out in the street when she heard the first gunshot and that the Suburban drove past the shooter.

### (5) Roy's Version

Roy testified that the Suburban pulled out first and stopped in the middle of the street in the inside lane ("the lane closest to the middle")—"like right in between the club entrance and about the end of the median."[22] Then the red car pulled out behind it into the outside lane ("the lane closest to the club") and stopped behind the Suburban. Kelly got out of the red car, walked in front of the red car, stopped about two feet from the Suburban in the area between the back door crevice and the front door on the passenger side, and started shooting inside of it. Roy stated that, as far

---

[22] Avenue E East has two lanes going east and two lanes going west, separated by a grass median.

23

as he could tell, no one in the Suburban fired back and that four to seven shots were fired. After that, Kelly returned to the red car and pulled out.

The Suburban pulled off to the left. Roy saw the Suburban reappear at a nearby gas station but did not see J.J. get out of the vehicle or drive away.

### c. At the Hospital

J.J. first realized Sheena had been hit when he pulled into the gas station. He took her to nearby Arlington Memorial Hospital (the "Hospital"), where she remained for the next seven and a half hours before she was pronounced dead from a gunshot wound to her head.[23]

Arlington Police Officer Chris Janssen testified that he heard a shooting call from the Hospital around 4:37 a.m. on February 25 and found J.J., who had blood on his shirt and pieces of skull on his clothing, in the waiting room. J.J. identified Chat as someone involved in the shooting.

Arlington Police Detective Benjamin Lopez and another detective interviewed J.J., Samantha, Cyntrell, and Donna on February 25. Officer Janssen testified that J.J. appeared upset and in shock when he spoke with him; Detective Lopez testified that J.J. was not incoherent or so intoxicated that he could not communicate.

### 4. After February 25, 2007

---

[23] Tarrant County Deputy Chief Medical Examiner Marc Krouse, who performed Sheena's autopsy, stated that the entry wound was on Sheena's right forehead, just above the outside of her eyebrow, and that the exit wound was on her head's left side.

24

J.J. told the police that the Suburban belonged to his girlfriend Telethia and that he could not give them permission to search it. Once they received permission to search the Suburban, police found Sheena's purse, containing marijuana and $480 in cash. J.J. testified that he did not take anything out of Sheena's purse, that he had not seen her with a gun, nickel-plated or otherwise, that evening, and that he did not throw anything—not a handgun or a shell casing—out of the Suburban.

J.J. kept a black .45 caliber handgun hidden under the Suburban's console. The police found it loaded and "cocked and locked,"[24] with Sheena's blood on it.[25] J.J. testified that he never kept the gun loaded, never shot it, and did not remember loading it or cocking it, although he also stated that it is something that he would have done if he had had the chance. He did not remember grabbing the gun at any time during the incident, but he acknowledged that it was possible that he did. When he spoke to the police on February 25, he did not mention his .45 in the Suburban.[26]

---

[24] The State's firearms examiner explained that "cocked and locked" means that the weapon has a round chambered and the hammer is on the rear ("cocked"), but that the thumb safety is still on ("locked"). "Cocked and unlocked" means that the weapon is ready to fire.

[25] A substantial amount of blood from Sheena's injury was deposited on the inside of the Suburban.

[26] Becker testified that based on her microscopic comparison on the nine cartridge cases found in the Afterlife parking lot and the street, it was impossible for the cartridges to have been fired from a .45. Becker stated that one reason no .45 casings were found in the parking lot was because the cartridge remains in a revolver like the .45 after firing until it has been physically opened and removed. In a semi-automatic, the cartridges are extracted and ejected for the next cartridge to be fed into the chamber.

Photographs of the Suburban's interior show a jacket placed in the back seat, covering part of the console and the floorboard. J.J. testified that he did not place the jacket there to cover up either drugs or blood, both found in the Suburban. However, Detective Lopez testified that the coat had to have been placed there after the shooting or it would have had blood on it. He testified that J.J. had obviously hidden the gun under the console and agreed that, from the gun's bloody condition, J.J. had obviously had the gun out at some point.

Detective Lopez looked for Chat. At Club Hard Bodies, he found Dwight, who provided Chat and Kelly's photos taken at the Afterlife on Valentine's Day. Detective Lopez located Chat's family, who gave police information to identify Kelly, and Roy identified Kelly from one of Dwight's photos as the person the police were looking for.

Ozuna testified that she did not find any bullet defects in the front of the Afterlife. Detective Lopez testified that, from the photographs of the Suburban, there were no gunshot defects and it did not appear to have been hit by gunfire on the wheels, rims, anywhere on the vehicle's body, or on the inside.[27] The Suburban's glass was completely intact, meaning that Sheena's window would have had to have been down at the time she was shot, and from the amount of blood inside the Suburban, Sheena could not have been shot while sticking her head outside the

---

[27] Officer Durham arrived at the Hospital around 4:50 a.m. on February 25 and secured the Suburban but did not touch the vehicle or notice any bullet holes in its driver or passenger sides.

26

window.  Sheena's wound was a "through-and-through" wound, meaning that there was an entry wound and an exit wound, but police did not find a projectile in the Suburban.

## B. Standard of Review

Because self defense is classified as a defense rather than an affirmative defense, we apply the factual sufficiency review generally applied to convictions to an appellant's factual sufficiency challenge to the jury's implicit finding against his self defense claim.  *Bundy v. State*, 280 S.W.3d 425, 433 (Tex. App.—Fort Worth 2009, pet. ref'd).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust.  *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417.  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict.  *Watson*, 204 S.W.3d at 417.

27

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

## C. Analysis

Kelly argues that "[t]he greater weight and preponderance of the credible evidence herein shows that [he] acted in self-defense from the apparent danger created by the anticipated attack of multiple assailants not only of himself but of a third party, [Chat], so that it is manifestly unjust" that he was convicted of murder. He contends that both Sheena and J.J. were armed that night and had used illegal substances, that there had been a prior fight between Samantha and Chat, that J.J. had threatened to kill Chat, that there had been a fight between Chat and Sheena in the club immediately prior to the shooting, that Chat expressed a reasonable fear of multiple assailants to Kelly, and that the occupants of J.J.'s vehicle fired first. And he states that "[v]irtually every witness whose story conflicts with [his] has a prior criminal record," making his testimony more credible than theirs.

28

The jury had to determine whether Kelly intentionally or knowingly caused Sheena's death by shooting at her (or at J.J.)[28] with a deadly weapon, or whether he intentionally, with the intent to cause serious bodily injury to Sheena (or J.J.), committed an act clearly dangerous to human life by shooting at Sheena (or J.J.) with a firearm, causing Sheena's death. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2). If the jury found that Kelly committed these acts, then to acquit him, it would have had to find that Kelly was justified in using force or deadly force to defend himself or Chat.

According to the law in effect at the time of the shooting,[29] a person is justified in using deadly force against another (1) if he would be justified in using force against another under section 9.31, (2) if a reasonable person in his situation would not have retreated, and (3) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or

---

[28] The jury was instructed on the law of transferred intent. *See* Tex. Penal Code Ann. § 6.04(b)(2) (Vernon 2009).

[29] The legislature has since amended penal code sections 9.31 and 9.32, but the offense for which the jury convicted Kelly occurred on February 25, 2007, before the September 1, 2007 effective date of the amendments. Our analysis of Kelly's appeal is therefore governed by the earlier statutes. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598, *and* Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, *both amended by* Act of March 27, 2007, 80th Leg., R.S., ch. 1, § 5, 2007 Tex. Gen. Laws 1, 2 (codified as an amendment to Tex. Penal Code Ann. §§ 9.31, 9.32 (Vernon Supp. 2009)) (stating that an offense committed before the act's effective date is governed by the sections in effect when the offense was committed).

29

attempted use of unlawful deadly force or to prevent the other's imminent commission of murder, among other offenses. *See* Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007); *see also Davis v. State*, 268 S.W.3d 683, 697–98 & n.3 (Tex. App.—Fort Worth 2008, pet. ref'd). At the time that this version of penal code section 9.32 was effective, section 9.31 provided that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 (amended 2007). The use of force against another is not justified in response to verbal provocation alone, nor is it justified if the actor provoked the other's use or attempted use of unlawful force unless the actor abandons the encounter or clearly communicates his intent to abandon while reasonably believing that he cannot safely abandon the encounter and the other person continues or attempts to use unlawful force against him. *See id.* A person is justified in using force or deadly force against another to protect a third person if, under the circumstances as he reasonably believes them to be, he would be justified in using force or deadly force to protect himself, and he reasonably believes that his intervention is immediately necessary to protect the third person. *See* Tex. Penal Code Ann. § 9.33 (Vernon 2003).

30

We conclude that there is factually sufficient evidence to support the jury's determination that Kelly did not act in self defense or in Chat's defense. That is, there were fact questions before the jury with regard to whether, from Kelly's standpoint, his use and degree of deadly force was immediately necessary to protect himself or Chat; whether a reasonable person in Kelly's situation would have retreated; whether Kelly reasonably believed that he or Chat was in danger of death or serious bodily injury; and whether Kelly provoked J.J.'s (or Sheena's) use or attempted use of unlawful force and failed to abandon the encounter or clearly communicate his intent to abandon the encounter. That is, the jury could have concluded from the evidence above (1) that Kelly and Chat had the opportunity to retreat several times that night and that a reasonable person would have, (2) that Kelly's shooting Sheena (or shooting at J.J. and hitting Sheena) was in response to only verbal provocation immediately prior to the shooting and that J.J. or Sheena did not draw a weapon first (if at all), or (3) even that Kelly and Chat went to the Afterlife intending to provoke a confrontation and failed either to abandon the encounter or to clearly communicate their intent to abandon the encounter.

Additionally, while it is undisputed that several of the actors had possession of a firearm at one time or another during the evening, the only evidence of shots actually fired (other than Chat's testimony) consists of the nine shell casings from the same nine millimeter gun, the type of gun that Kelly carried, admitted shooting at the Suburban, and then destroyed. The jury could have chosen not to believe Chat's

31

testimony that J.J. fired at Kelly first, particularly in light of Kelly's testimony that there were no bullet holes in the car he drove that night. In short, the jury had the responsibility to determine witness credibility and could have chosen who and what portion of testimony to believe and to disbelieve. We cannot say, viewing the evidence in a neutral light, that the jury's determination is clearly wrong and manifestly unjust or that the conflicting evidence so greatly outweighs the evidence supporting Kelly's murder conviction that the jury's determination to implicitly reject Kelly's self defense and defense of others claims is manifestly unjust. *See Watson*, 204 S.W.3d at 414–15, 417. We overrule Kelly's first point.

## IV. Closing Argument

In his second point, Kelly complains about the following italicized portions of the State's closing argument during the trial's guilt-innocence phase:

> [State]: . . . First, you have to consider, is the Defendant guilty of murder? Did the Defendant intend to kill Sheena Perkins, or did he intend to kill J.J. Coffey and instead strike Sheena and kill Sheena? And the answer's yes. *If you find that the Defendant committed murder, then and only then will you consider self-defense.*

> [Defense]: I'm going to object to that, Judge. That's a misstatement of the law. That's not the state of the law. They don't have to find murder before they get to self-defense. That's a clear misstatement of the law.

> [State]: Judge, if they find him not guilty, they don't get to self-defense.

> The Court: All right. Overruled.

32

[State]: . . . . And there are two requirements here that are very, very important. And the first is, *if I'm going to use deadly force, there has to be a duty on my part to retreat before I use that deadly force. And that duty, when you-all look at it, will be from each one of your perspectives. All right? Not from whether the Defendant could see a duty to escape or could see an avenue of escape; whether you-all, placed in that situation that night on the 25th of February of 2007 in Tarrant County, Texas, would have retreated.*

[Defense]: Well, I'm going to object to that, Judge, as a misstatement of the law. It's not what these folks would have done. It's what an ordinary, reasonable, prudent person would have done in the Defendant's shoes.

[State]: I would submit that these 12 jurors, Your Honor, are ordinary and reasonable and prudent individuals.

The Court: I am going to sustain the objection.

[Emphasis added.]

We initially note that Kelly did not preserve his second objection. *See* Tex. R. App. P. 33.1(a); *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) ("The essential [preservation] requirement is a timely, specific request that the trial court *refuses*." (emphasis added)). With regard to his first objection, Kelly complains that the State's argument that the jury must have first found that he committed murder before it considered self defense is "a clear misstatement of the law and the instructions given in the charge."

## A. Standard of Review

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable

deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

If a jury argument exceeds the bounds of proper argument, a trial court's erroneous overruling of a defendant's objection is not reversible error unless it affected the appellant's substantial rights. Tex. R. App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). In determining whether the appellant's substantial rights were affected, we consider (1) the severity of the misconduct (i.e., the prejudicial effect of the prosecutor's remarks), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Martinez*, 17 S.W.3d at 692–93; *Mosley*, 983 S.W.2d at 259.

## B. Analysis

Assuming without deciding that overruling Kelly's objection was error, we hold that it was harmless, and we reject Kelly's argument for two reasons. First, the timing is immaterial. If, as argued by the State, the jury first found that Kelly committed murder but then found that he was acting in self defense, he would have been found not guilty. If, as argued by Kelly, the jury believed that he acted in self defense, and therefore did not commit murder, he also would have been found not guilty. *See Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) ("[T]he

34

State has the burden of *persuasion* in disproving the evidence of self-defense. That is not a burden of *production*, i.e., one which requires the State to affirmatively produce evidence refuting the self-defense claim, but rather a burden requiring the State to prove its case beyond a reasonable doubt. . . . [C]ase law instructs us that the issue of self-defense is an issue of fact to be determined by the jury.") (internal citations omitted). The bottom line is that Kelly presented his self defense theory, and the jury disbelieved it.

Second, we turn to the three *Martinez* factors and recall that for an improper jury argument to warrant a reversal, it must be "extreme or manifestly improper." *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 837 (2000). The first factor weighs in the State's favor because the prosecutor's conduct was mildly prejudicial, if at all, making this argument only once and not commenting on Kelly's presentation of self defense evidence. No curative measures were taken after the trial court overruled the objection; however, the certainty of conviction tips the balance in the State's favor because, as previously explained, the complained-of argument did not touch upon the case's facts regarding self defense—a fact issue to be determined by the jury. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). Therefore, assuming the trial court erred by overruling Kelly's objection, the error was harmless. We overrule Kelly's second point.

## V. Conclusion

35

Having overruled both of Kelly's points, we affirm the trial court's judgment.


PER CURIAM

PANEL:  MCCOY, GARDNER, and WALKER, JJ.


DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 30, 2010